Marc P. Berger
Lara S. Mehraban
Sheldon L. Pollock
Howard A. Fischer
Barry O'Connell
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS CARTER RONK, <br><br> Defendant. | **COMPLAINT** <br><br> **ECF CASE** <br><br> **18 Civ.** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this Complaint against Defendant Thomas Carter Ronk ("Ronk" or "Defendant"), and alleges as follows:

<u>**SUMMARY**</u>

1.    This case concerns three separate fraudulent schemes perpetrated by the Defendant.  First, Ronk engaged in fraudulent promotional efforts to sell or assist in the sale of the common stock of microcap issuers Casablanca Mining Ltd. ("Casablanca"), and Gepco, Ltd.

("Gepco").  As set forth in greater detail below, between May 2012[1] and September 2014, Ronk made numerous misleading statements or misstatements of material fact while promoting the sale of these stocks to investors.

2.      Second, over the same period from at least May 2012 to September 2014, Ronk made false statements to prospective investors in connection with a private stock offering by WealthMakers, Ltd. ("WealthMakers"), a private company he co-founded.

3.      Third, Ronk manipulated the trading price of the common stock of Casablanca and Gepco during the period from at least May 2012 to September 2014.  Rather than allow the markets to set the price of the companies' securities through the natural interplay of supply and demand, the Defendant engaged in a number of practices aimed at misleading the market to increase and maintain artificially high prices so that he and others could sell off their holdings for substantial gains.

4.      For his participation in the three fraudulent schemes Ronk directly or indirectly received proceeds of the offering frauds as well as gains from the market manipulation schemes.

## VIOLATIONS

5.      By virtue of the conduct alleged herein, Ronk violated Section 17(a)(1), (a)(2), and (a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), 77q(a)(2), and 77q(a)(3)], Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

---

[1] Any time-related defenses for the conduct alleged in this Complaint have been tolled for the period from May 5, 2017 through November 8, 2018, inclusive.  As a result, that period of time is not to be included in calculating any limitations period or the period of any other time-related defenses.

6.     Unless Ronk is permanently restrained and enjoined, he will again engage in the acts, practices and courses of business set forth in this Complaint and in acts, practices and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.     The Commission brings this action under the authority conferred upon it by Sections 20(b) and (d) of the Securities Act [15 U.S.C. § 77t(b), (d)], and Sections 21(d)(1), (3) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (3), (5)].  The Commission seeks a final judgment:  (i) restraining and permanently enjoining the Defendant from engaging in the acts, practices, transactions, and courses of business alleged herein; (ii) requiring the Defendant to disgorge the ill-gotten gains he received as a result of the violations, and to pay prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (iii) imposing civil monetary penalties upon the Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iv) imposing a penny stock bar against the Defendant pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (v) issuing an order barring the Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].  Finally, the Commission seeks such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

9.      Venue lies in this District pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act [15 U.S.C. §§ 77v(a), 78aa(a)].  Some of the acts, practices, courses of business and transactions constituting the violations alleged herein occurred within the Southern District of New York.  For example, among other things, multiple participants in the fraudulent scheme, including Ronk, communicated with and conducted business transactions with Casablanca and Gepco's transfer agent, Continental Stock Transfer & Trust Company, at 17 Battery Place, New York, New York 10006, and shares transferred to Ronk were held at the Depository Trust Corporation at 55 Water Street, New York, York 10004.  In addition, some investors in Gepco and WealthMakers were, as of March 2014, domiciled in the Southern District of New York.

## DEFENDANT

10.      **Ronk**, age 50, resides in Corona Del Mar, California.  Ronk held multiple securities licenses and was associated with a number of registered broker-dealers between 1992 and 1998.  Ronk was the President and a Director of Casablanca and served in various official capacities at WealthMakers, including at times as its part-owner, President and Chief Analytics Officer.  Ronk is also the sole owner, President and Chief Executive Officer of Buyins.net, Inc., a stock promotion website or firm, as well as the sole owner of Century Pacific Investments LLC, a registered investment adviser.

## RELATED INDIVIDUALS AND ENTITIES

11.      **Izak Zirk de Maison (f/k/a Izak Zirk Engelbrecht) ("Engelbrecht")**, age 61, is currently incarcerated at the Lompoc Federal Correctional Institution in Lompoc, California.  Between at least 2008 and September 2014, Engelbrecht served as an officer and director of various microcap issuers, including Casablanca and Gepco.  Engelbrecht also served as a

Cofounder, Director and Vice-President of WealthMakers. Engelbrecht was previously enjoined in a securities fraud enforcement action in this court involving, *inter alia*, some of the same issuers, entitled SEC v. Cope et al., 14 Civ. 7575 (S.D.N.Y., final judgment entered on Oct. 13, 2015), and pled guilty to various offenses, including securities fraud, in a parallel criminal action before the United States District Court for the Northern District of Ohio, in United States v. Izak Zirk De Maison, Crim. Information No. 1:15-cr-117 (N.D. Ohio, Apr. 2, 2015), for which he was sentenced to a term of imprisonment of 151 months.

12.   **Kieran Kuhn**, age 36, is currently incarcerated at USP Lewisburg in Lewisburg, Pennsylvania. From approximately January 2012 to September 2014, he was the principal of Small Cap Resource Corp., or SCR, a New York investor-relations firm that published a subscription-based newsletter offering investment advice, where, in exchange for undisclosed kickbacks from Engelbrecht, he and a staff of cold callers solicited investments in Gepco's stock in the open market and Gepco stock and notes in purported private placements. Kuhn was previously enjoined in a securities fraud enforcement action in this court involving, *inter alia*, some of the same issuers, entitled SEC v. Cope, and pled guilty to various offenses, including securities fraud, in a parallel criminal action before the United States District Court for the Northern District of Ohio, in United States v. Kieran T. Kuhn, Crim. Information No. 1:15-cr-288 (N.D. Ohio, Sept. 18, 2015), for which he was sentenced to a term of imprisonment of 44 months.

13.   **Buyins.net, Inc.** is a California corporation formed on December 24, 2010 and headquartered in Corona Del Mar, California, wholly owned and operated by Ronk. Buyins.net is a web-based stock research company that purports to aggregate short trade data "on over 7,000 NYSE, AMEX, and NASDAQ stocks" and "nearly 8,000 OTCBB and PINKSHEET stocks" to

provide investors with the "exact price point where short sellers start losing money" and when "a short squeeze will begin in each stock."

14.     **Century Pacific Investments, LLC** is a California registered investment adviser with its place of business in Corona Del Mar, California.  It is wholly owned by Ronk, its Managing Member, and reports one million dollars in assets under management on its latest Form ADV filed on March 31, 2018.

15.     **WealthMakers, Ltd.** was a Wyoming corporation formed on January 23, 2007. Ronk served as President and Chief Analytics Officer and owned an approximate fifteen percent stake in WealthMakers.  WealthMakers purported to be a "Wall Street research and trading firm providing unbiased statistical stock market predictions" for paying subscribers.  WealthMakers was never registered in any capacity.

16.     **Casablanca Mining Ltd.** (ticker symbol CUAU) was originally incorporated as USD Energy Corporation (UEGY) in Nevada in 2008 and is headquartered in Corona Del Mar, California.  Casablanca purported to operate a gold mine in Chile.  The company's common stock was registered pursuant to Section 12(g) of the Exchange Act and subject to Exchange Act reporting obligations pursuant to Section 13(a) until September 6, 2018 when registration was terminated.  The last periodic report it filed was its March 31, 2013 periodic report filed on Form 10-Q on June 13, 2013.

17.     **Gepco, Ltd.** (ticker symbol GEPC) is a Nevada corporation with its principal place of business in Santee, California.  In October 2013, the company completed a reverse merger with a privately-held Nevada corporation, GemVest, Ltd. ("GemVest").  The resulting company purported to "broker high end investment grade diamonds."  Gepco's common stock was previously quoted on OTC Link.

## FACTS

**I.    Ronk Made Materially False or Misleading Statements
        Concerning Casablanca and Gepco**

18.    Between May 2012 and September 2014, Ronk made numerous misleading statements or misstatements of material fact while promoting the sale of Casablanca and Gepco stock to investors.

**A.    Ronk's Misstatements Concerning Casablanca**

19.    In late 2012 and early 2013, Ronk disseminated marketing materials concerning Casablanca with numerous material misstatements about its basic operations as a supposed gold mining business.

20.    For example, in one marketing document, which Ronk wrote and sent to potential investors on or around January 2, 2013, Ronk described Casablanca as a company that "engages in the acquisition, exploration, development, and operation of precious metal properties in South America." The same document described a variety of mines that the company owned. The marketing document stated that Casablanca's gold mining "operations are based near Santiago, Chile" and stated that the Company was engaged in the "operation of precious metal properties." These statements were false and misleading because they gave the impression of economically viable operations when none existed.

21.    The same document went further and claimed that those "properties" included "80 different mining and mineral exploration claims." For example, it stated that the "Las Dichas" property "started 10,000 cubic/meters per month production and currently seeing .25 grams per cubic meter;" that the "Free Gold 100% owned" property had "40,000 ounces [of gold] in Phase 1 and 140,000 ounces in California Mine;" that the "Los Pinos Gold 70% owned" property had hit a "1 million ounce target," had "small scale production Q1 2013" and "fullscale drilling

7

program and 43-101 Reserve Report in 2013;" and in reference to the "Casuto Gold 100% owned" property that "over 1 million ounces [of gold] have previously been extracted from the Casuto Property." These statements too were false and misleading.

22.     Ronk repeated these misstatements in his newsletters to Buyins.net followers. For example, Ronk announced a stock prediction concerning Casablanca to his Buyins.net followers on December 19, 2012 and included in that announcement the false or misleading statement that Casablanca was a company engaged in the "operation of precious metal properties."

23.     These statements created the impression that Casablanca had an active, productive mining operation. In reality, no mining had ever been done by the company and there were no contracts in place with anyone to purchase any mined product.

**B.     Ronk's Misstatements Concerning Gepco**

24.     From at least January 2014 to August 2014, Ronk pursued similar promotional efforts on behalf of Gepco, a microcap issuer controlled by Engelbrecht that supposedly brokered high end diamond sales. Ronk's efforts were instrumental in a scheme led by Engelbrecht and his confederates to pump up the price of Gepco shares so that Engelbrecht and his allies would be able to dump their shares.

25.     Century Pacific Investments, the registered investment adviser that Ronk wholly owned, published a marketing document concerning Gepco on January 19, 2014. This January 19, 2014 marketing document included a summary table on the front page reflecting "expected" revenue figures for 2014, 2015, and 2016, as $45 million, $58 million, and $76 million, respectively. The same summary table identified "expected" "earnings per share" for those three years and listed a "market capitalization" figure of $25 million. These projected revenues were made without any reasonable foundation.

26.     The document then stated that Gepco management anticipated that it would sell diamonds on a wholesale basis and that "each wholesale diamond order will carry a ticket value of $300,000 to $500,000 and gross margins of approximately 30%-40% that can be expected from their sales with an average sales turn rate of 90-120 days." Similarly, these projections were baseless.

27.     Ronk, who was provided the projections by Engelbrecht's associate, repeated the claims to investors without taking any steps to confirm the basis for the figures or their accuracy. Ronk knew at the time he published these projections to investors that Gepco did not own any diamonds to sell and had no basis to believe it could acquire or sell diamonds of that value or in that volume.

28.     Furthermore, when Ronk distributed the January 19, 2014 Century Pacific Investments brochure to investors, baselessly touting Gepco's expected revenues, Ronk did not disclose to Gepco investors that Ronk's Century Pacific Investments signed a fee agreement to earn ten percent of any money raised or generated from Ronk's efforts to sell the stock. Nor did Ronk disclose the indirect compensation he received from Engelbrecht (Gepco's undisclosed control person), who paid for his business expenses. Due to Ronk's failure to disclose this consideration, investors were falsely led to believe that Ronk was providing unbiased, independent advice concerning their investments.

29.     Ronk drafted and sent to investors a marketing document dated February 2014 containing misrepresentations. The document, promoting investment in Gepco, significantly overstated the qualifications of Engelbrecht's wife, who was listed as the Executive Chairman of Gepco. Specifically, Ronk described her as an "investment strategist" and "capital formation expert" who has "focused her capital formation expertise in private equity and has created

hundreds of millions of dollars in shareholder value." These statements were false. In truth, Engelbrecht's wife was a real estate broker. Ronk subsequently admitted during testimony, "I don't think she had ever done a private equity transaction in her life. I don't even think she knew what one was."

30.     Again, when Ronk sent the February 2014 Gepco marketing document to investors, he did not disclose Century Pacific Investment's fee agreement with Gepco, nor did he disclose the indirect compensation he received from Engelbrecht, which falsely led investors to believe that Ronk was providing independent advice.

31.     Ronk also made misrepresentations to various investors, including an investor based in San Diego, California, ("Investor A"). During one-on-one personal solicitations for investments in Gepco in 2014, Ronk did not disclose that Century Pacific Investments, Ronk's solely-owned investment advisory firm, was contractually obligated to be paid ten percent of all Gepco stock sales it initiated. Ronk similarly did not disclose that he was doing promotional work for Gepco at Engelbrecht's behest, or that Engelbrecht was paying Ronk's overhead costs for his various businesses.

32.     Ronk presented Gepco to Investor A as a stock recommendation generated purely by algorithmically-driven research. Ronk falsely led this investor to believe that, like an outside analyst performing due diligence, Ronk met with Gepco officers on an arm's length basis to learn about promising business developments. In truth, Ronk was financially incentivized to promote Gepco stock.

33.     Ronk also misled Investor A about his own investment in Gepco, claiming that he held a large position in Gepco stock. For a six month period, Ronk encouraged Investor A to increase his purchases of Gepco stock by falsely representing that he (Ronk) too was adding to

his position and purchasing at specific points.  And then when Investor A sustained trading losses Ronk falsely sympathized by claiming that he had lost millions of dollars in Gepco.  In truth, Ronk never owned any Gepco shares.

## II.   Ronk Made Materially False or Misleading Statements Concerning WealthMakers

34.     From at least June 2012 to the middle of 2014, Ronk carried out an offering fraud for a private company called WealthMakers.  WealthMakers purported to be a Wall Street research and trading firm that used unbiased statistical methods to make stock market predictions.

35.     In Ronk's efforts to promote the private sale of WealthMakers' securities, he misled investors about, among other things, WealthMaker's trading technology and ability to deliver investment returns.  Ronk sought private sales of WealthMakers' stock on the basis that funds raised would be used for investments, or for developing WealthMakers' operational capacities.

36.     From summer 2012 through mid to late 2013, Ronk created various marketing materials, including a brochure about WealthMakers dated "Summer 2012."  These materials described a computerized investment system referred to as the "Global Automated Trading Systems" or "GATS" or, alternatively, "WealthMakers Online Predictive Research" or "WOPR."  These materials were distributed to potential and actual investors at least from June 2012 through at least mid-2013.  In these written materials, as well as in oral presentations to investors, Ronk described GATS and/or WOPR as a computerized predictive model that he falsely claimed had a history of successful trading.

37.     These written materials further claimed that GATS and/or WOPR utilized "a military-style computer that uses parallel processing, genetic algorithms, neural networks and

unbridled computing power" to analyze "exactly what event will move each stock, in which direction, to what % degree, the specific amount of time and with what degree of probability." These statements were misleading and false. In fact, the "WOPR" acronym was based on the name of the computer from the 1983 film "War Games."

38.     The WealthMakers "Summer 2012" brochure described GATS and/or WOPR as a "powerful database technology" and falsely claimed that it was "[b]ased on IBMs work on Deep Blue (now called "Watson")." WealthMakers never directly licensed any information technology from IBM. The same WealthMakers "Summer 2012" brochure also falsely claimed that 16 years and $60 million dollars went into the development of the computer systems used by WealthMakers. These statements were false because neither Ronk nor WealthMakers invested 16 years or $60 million into the computer systems used by WealthMakers, nor did any of the companies from which WealthMakers licensed technology.

39.     Ronk also claimed, in a written WealthMakers promotional brochure, that he, along with Engelbrecht and his wife, were among those who contributed "approximately $7 million" in "seed capital" to start WealthMakers. These statements were untrue. Neither he, nor Engelbrecht, nor anyone else invested any amount close to $7 million cash into WealthMakers.

40.     Ronk again misrepresented the expertise and experience of Engelbrecht's wife, who was to purportedly play a role in managing WealthMakers as its Chief Operating Officer. In fact, Engelbrecht's wife had no involvement with managing WealthMakers at the time these statements were made, and she did not have the extensive financial background set out in the promotional and offering materials. She was touted as being known for completing "impossible deals" in "real estate related financing." In fact, Ronk has subsequently described her as not having "the acumen to be working on anything regarding Wall Street" and has explained his

12

statements about her work in real estate financing as referring to her ability to refer homebuyers to private banks for home ownership loans.

41.    Ronk also asserted in WealthMakers' 2012 and 2013 offering materials that $4 million of the funds raised would be used for making investments.  In truth, no moneys were ever used to make investments.

### III.    Ronk's Fraudulent Scheme to Manipulate Trading Prices of Casablanca and Gepco

42.    From at least May 2012 to September 2014, Ronk engaged in a concerted effort to manipulate the trading prices of Casablanca and Gepco stock on the open market.  Ronk engaged in this manipulative conduct for the purpose of inflating the prices of those securities, to make Casablanca and Gepco shares more attractive to investors, and to benefit his own and his associates' financial interests.

#### A.    Casablanca

43.    Ronk engaged in several kinds of conduct designed to prop up the price of, and make Casablanca shares more attractive to the public.  First, among other things, Ronk attempted to "mark the close" as a manipulative technique to artificially elevate Casablanca's price at the end of a given trading day.  For example, on August 6, 2012, Ronk directed Kuhn to trade Casablanca stock at the end of the day.  He texted Kuhn at 3:28 pm, "Can u close CUAU at offer please."

44.    Second, Ronk also sought to prime the market at the beginning of the day with orders submitted at the opening ask price.  On December 19, 2012, he wrote to Kuhn at 9:26 am, just before the market opened, "We need to chase CUAU higher at the open bro."  Ronk expected that, when the market opened, Kuhn would purchase the stock at the current ask price in order for trading to commence at a higher price than the previous trading day.

13

45.     Third, Ronk traded with the intent of keeping Casablanca's price at or above one dollar.  Ronk believed that a stock price of one dollar or higher looked more "credible."  With this intention, Ronk entered an order to buy 200 shares of Casablanca stock at $1.05 on June 22, 2012 in a WealthMakers brokerage account.  In a text message to Kuhn, Ronk wrote, "That was me on CUAU … 200 at 1.05.  I can't stand to see it under $1."  Ronk's purchase of $1.05 was the highest trade of the day.

46.     Text messages on December 19, 2012 illustrate how Ronk and Kuhn worked in tandem, throughout the trading day, to arrange buyers to support Casablanca's price.  Ronk provided specific purchase instructions on price and order size:

**Ronk:** "Buy some at $.30 please"
**Ronk:** "Asap"
**Kuhn:** "….one of my guys making some moves in his portfolio.  Hold onto your seat.  5 min"
**Ronk:** "Kick fucking ass!!!!!!!!"
**Kuhn:** "Here we go.  Get ready to see 35"
**Ronk:** "You r [sic] my hero!!!!"
**Ronk:** "Awesome!!!!!!"
**Ronk:** "Look at it go!"
**Kuhn:** "That's my bid"
**Kuhn:** "Another 50k going now"
**Ronk:** "I love you bro.  Thank u so much!!!!"
**Kuhn:** "Jesus…there was my bid"
**Ronk:** "We just keep attacking.  We are breaking them bro.  I am on the phone calling people"
**Kuhn:** "Second order going now"
**Ronk:** "ok"
**Ronk:** "Look at u go!!!!!!!  Thank u"
**Ronk:** "Can u print a small one at offer.  Trying to bring in a 50,000 share buy"
**Kuhn:** "Yup"
**Ronk:** "100 at .30 please.  Big buyer on the hook"
**Ronk:** "100 at offer please"

47.     Ronk repeatedly called investors and urged them to submit buy orders in Casablanca to bolster its share price.  In the over-the-counter market, where microcap stocks are traded, there is an "ask" or "offer" price (referring to the lowest price at which a market maker

will sell a specified number of shares at any given time) and a "bid" price (referring to the highest price a market maker will pay to purchase the stock). The "offer" price will almost always be higher than the bid price. Ronk and Kuhn coordinated efforts to have buyers in the market execute Casablanca trades at the higher offer prices being quoted, so as to replace the previous lower-priced transactions and thereby establish a new, higher prevailing market price.

48. Through Ronk's stock promotion website Buyins.net, Ronk promoted Casablanca stock and specifically worked to manipulate demand for the stock. Ronk drafted and then issued "SqueezeTrigger Reports" that recommended investors purchase Casablanca stock in advance of a purported short squeeze. Ronk boasted an ability to utilize sophisticated technology and stock data analysis to pinpoint times when short sellers in the market (those who have a sell side interest in the stock) would seek to buy back their stock, or "cover" their positions at increasing prices. After disseminating the reports, Ronk advised investors to buy the stock, often at specific prices and quantities, in order to generate the buy side activity that would fulfill his own short squeeze prophecy.

49. For example, on December 19, 2012, Ronk published a ShortTrigger Report indicating that "we have trapped 1.5 million share short at an average price of $0.24 … Buyins.net is predicting that these shares will start squeezing now!" Following distribution of this announcement to his followers, he sent specific emails to individual followers stating "We have a short squeeze just starting on CUAU … Look at the news we put out today. We are picking up steam and stock is +20% today alone."

50. Similarly, on March 19, 2013, Buyins.net issued a SqueezeTrigger Report indicating that "Short Sellers down $1.72 million as CUAU short squeeze tarts to pick up steam," adding further that "Buyins.net issued a short squeeze alert on Casablanca Mining at

$0.40 and the stock is +50% in just a few trading days.  See chart below."  Subsequent to issuing
this alert to followers, Ronk again contacted individual followers asking "Please make a nice FB
and twitter post from pics below.  CUAU should hit $0.70 early in trading day.  It is going much
higher!!!!"

51.     Finally, Ronk also engaged in fraudulent "scalping" practices in trading
Casablanca shares.  Ronk recommended that his Buyins.net followers buy Casablanca without
disclosing that he was intending to create buying interest and increase the stock's price so that he
could sell his own Casablanca holdings at higher prices.  For example, while promoting the stock
through dissemination of SqueezeTrigger Reports, Ronk directed sales on the open market of
Casablanca stock held in a WealthMakers brokerage account.  Specifically, on March 19, 2013,
Ronk issued a Casablanca-related SqueezeTrigger Report, to rally purchasing activity and a price
increase, and then sold 15,000 shares of Casablanca shares in a WealthMakers account on March
20, 2013 at higher prices.

### B.     Gepco

52.     Ronk often coordinated directly with Kuhn in order to prompt others to trade in
Gepco, or to coordinate their own manipulative trading in Gepco.  The following text message
exchange between Ronk and Kuhn on March 17, 2014 illustrates Ronk's effort to increase the
price of Gepco, and specifically how he and Kuhn worked together to recruit and instruct other
investors to trade the stock:

**Ronk**:  "I have 10k coming now"
**Kuhn**:  "Ok I'm on it to[o] trying to pull it together"
**Ronk**:  "That was me bro.  I fixed that"
**Ronk**:  "That is my bid too"
**Ronk**:  "We are under pressure bro.  Rally the room"
**Kuhn**:  "It's what we do all day everyday Tom.  Everyday, I'm in it [sic]"
**Ronk**:  "I may be taking out the .23 now"
**Ronk**:  "I am asking a guy for 50k at .29"

**Ronk**: "50k at .29 coming"
**Ronk**: "Shit.  This guy is taking too long"
**Kuhn**: "Yeah, now is the time we need it bad"
**Ronk**: "He emailed me that he will let me know when it fills.  Fingers crossed"
**Ronk**: "This 50k still pending......."
**Kuhn**: "Waiting on 30K at 28"
**Kuhn**: "Sons of bitches"
**Ronk**: "Good job bro[] we are up against a wall today"
**Ronk**: "They are stubborn"
**Kuhn**: "Can't go up everyday [sic]"
**Ronk**: "I lose peo[ple] when it drops"

53.     Ronk also personally solicited investors to buy Gepco.  These investor purchases had the effect of creating demand for the shares and allowed the scheme participants to sell their shares for profit.

54.     Between February 2014 and August 2014, Ronk solicited an investor from Poway, California ("Investor B") to purchase over 700,000 shares of Gepco stock on the market at a total cost of approximately $98,695.  Investor B's Gepco purchases were usually prompted by Ronk's direction to buy, including guidance he provided as to price, amount, and timing of purchases.

55.     For example, on March 4, 2014, Investor B purchased 121,000 shares of Gepco.  That day Ronk traded 233 text messages with Investor B between the trading hours of 8:25 a.m. and 4:30 pm Eastern Time.  Ronk's text messages with Kuhn during the same time period reflect Ronk's intent to find price support for Gepco ("I may be able to take out the .27" – referring to the low bid price, "I have 5000 coming," "I think I have a buyer coming," "I have 10k coming now," "We are under pressure bro, Rally the room").  These communications were simultaneous with and parallel to Investor B's purchase of 121,000 Gepco shares, the largest period of Gepco trading activity in the account.

56.     Using the same techniques as in the Casablanca scheme, Ronk issued SqueezeTrigger Reports through Buyins.net to attract buyers in the open market and manipulate demand.

57.     For example, a SqueezeTrigger Report, dated August 14, 2014, announced "stock is about to cross above its $0.15 SqueezeTrigger Price . . . . Squeeeeeeeze is coming."  In order to create a self-fulfilling price increase, Ronk advised investors to purchase shares at increasingly higher prices.  On August 14, 2014 Gepco stock moved from $0.11 to $0.1498 before closing back at $0.125.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

58.     Paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

59.     By virtue of the foregoing, Ronk, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, knowingly or with reckless disregard for the truth: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

60.     By virtue of the foregoing, Ronk violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

18

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(b) of the Securities Act

61.     Paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

62.     By virtue of the foregoing, Ronk, directly or indirectly, singly or in concert, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, published, gave publicity to, or circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, described such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

63.     By virtue of the foregoing, Ronk violated and, unless restrained and enjoined, will continue violating, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## THIRD CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

64.     Paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

65.     By virtue of the foregoing, Ronk, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) has engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

66.     By virtue of the foregoing, Ronk violated, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Ronk and his respective agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Sections 17(a) and 17(b) of the Securities Act [15 U.S.C. § 77q(a) and (b)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Ordering Ronk to disgorge, with prejudgment interest, all ill-gotten gains from the conduct alleged in this Complaint.

### III.

Ordering Ronk to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering Ronk to be barred from participation in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6).

**V.**

Ordering Ronk to be barred from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e) and Section 21(d)(2) of the Exchange Act [15. U.S.C. § 78u(d)(2)].

**VI.**

Granting such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
           September 28, 2018

Respectfully submitted,

Marc P. Berger
Lara S. Mehraban
Sheldon L. Pollock
Howard A. Fischer
Barry O'Connell

New York Regional Office
SECURITIES AND EXCHANGE
   COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0589 (Fischer)
*Attorneys for the Plaintiff*